**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 00-31107

---

JESSIE VERDINE,

Plaintiff,

VERSUS

ENSCO OFFSHORE CO.,

Defendant-Third Party Plaintiff-Appellant,

VERSUS

CENTIN LLC, formerly known as Centin Corp.

Third Party Defendant-Appellee.

---

Appeal from the United States District Court
for the Western District of Louisiana

---

June 22, 2001

Before EMILIO M. GARZA, PARKER, Circuit Judges, and ELLISON, District Judge.[*]

ROBERT M. PARKER, Circuit Judge:

This case involves the application of the Louisiana Oilfield Anti-Indemnity Act (the "Act") to an agreement between Ensco Offshore Company and Centin LLC for repairs on a dismantled fixed platform rig. The district court denied Ensco's motion for summary judgment and granted summary judgment in favor of Centin. The court

---

[*]District Judge of the Southern District of Texas sitting by designation.

1

concluded that the Act invalidated the choice of law provision and defense and indemnity clause in the parties' contract.[1]

## I.

In August of 1997, Ensco entered into a Day Work Drilling Contract with Amerada Hess Corporation in which Ensco agreed to provide the fixed platform rig Ensco 23 for use on approximately six wells off the coast of Louisiana. Before Ensco could fulfill its contract obligations to Amerada, Ensco 23 required extensive refurbishment work. Ensco hired Centin to perform the necessary services.

Centin signed a master service contract with Ensco in which Centin agreed to provide goods and services on Ensco's land and offshore drilling rigs. The master service contract provided the general rights, duties and obligations of the parties. The contract required that its terms be interpreted and enforced "in accordance with the provisions of the General Maritime Law of the United States." The contract also required Centin to defend and indemnify Ensco for claims arising from injuries related to the contract.[2]

---

[1]The district court asserted diversity jurisdiction pursuant to 28 U.S.C. § 1332. This Court has jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291.

[2]The defense and indemnity provision in the contract states:
Contractor agrees to protect, defend, release, indemnify and hold Company and its parent, subsidiary, associated or affiliated companies and the directors, officers, employees, servants and agents of any of them, free and harmless from and against any and all losses, costs, claims, causes of action and liabilities (including, without limitation, the costs of suit and reasonable attorney's fees) arising in favor of any party on account of injury to, or death of, or damage to or

The agreement did not require work on any specific platform owned by Ensco. Ensco controlled each specific job through work or purchase orders.

Ensco instructed Centin to perform services on the Ensco 23 through several specific purchase orders and field requisitions. No reference was made in any purchase order or field requisition to the wells operated by Amerada. Centin performed all of the work at the Coral Marine fabrication yard in Amelia, Louisiana.

On March 30, 1999, plaintiff Jesse Verdine, a Centin employee, filed suit against Ensco for damages he received while working on the Ensco 23. Ensco filed a third-party complaint against Centin seeking defense and indemnity for Verdine's claim. Centin denied Ensco's claim for defense and indemnity based on the Louisiana Oilfield Ant-Indemnity Act. *See* LA. REV. STAT. § 9:2780. Both parties filed motions for summary judgment.

After reviewing the evidence, the district court granted summary judgment in favor of Centin. The court determined that the Act applied to the parties' agreement and that the statute therefore voided the contract's choice of general maritime law. Ensco eventually settled with the plaintiff, and the district court entered its final judgment dismissing the case on August 10, 2000.

---

loss of property of Contractor, its associated or affiliated companies, contractors or subcontractors and their directors, officers, employees, servants or agents, invitees or guests or the survivors of any of them, resulting from or related in any way to this Agreement, or activities or omissions in connection herewith, regardless of whether the Company, or others, may have been solely or concurrently negligent, to any degree, or otherwise at fault, and regardless of any unseaworthiness of any vessel, any defect in premises, goods, equipment or materials, and irrespective of whether same preexisted in this Agreement.

Ensco timely appealed.

## II.

We review a district court's order granting summary judgment under the same standard that guided the district court. *See Roberts v. Energy Dev. Corp.*, 104 F.3d 782, 784 (5th Cir. 1997). Ensco argues on appeal that the Act does not apply to the parties' agreement and that the parties' choice of maritime law should control. If maritime law applies to the contract, the defense and indemnity provision will be enforceable against Centin. *See Dupont v. Sandefer Oil & Gas, Inc.*, 963 F.2d 60, 61 (5th Cir. 1992).

In federal diversity cases involving conflicts of law, the law of the forum state, here Louisiana, governs. *See Roberts*, 104 F.3d at 786 (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). Louisiana generally allows parties to select the law that will determine the outcome of disputes arising from a contract. *See* LA. CIV. CODE ANN. art. 3540; *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631 (5th Cir. 1986). The Louisiana Civil Code states:

> All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

LA. CIV. CODE ANN. art. 3540.[3]

---

[3]Article 3537 states that "an issue of conventional obligation is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." LA. CIV. CODE ANN art. 3537. Louisiana is the only state whose policies could be impaired by the defense and indemnity provisions in the Ensco-Centin agreement. In addition, the work on Ensco 23 was performed entirely on land, negating any national interest in the uniformity of maritime law. *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 677 (1982); *Rodrigue v. Legros*, 563 So.2d 248, 254

4

The parties are in agreement that, notwithstanding the choice-of-law provision, Louisiana law would govern the terms of the contract.

Louisiana contract law generally "allows a principal to be indemnified against his own negligence so long as that intent is clearly expressed." *Rodrigue*, 563 So.2d at 254. The Oilfield Ant-Indemnity Act creates a public policy exception to the general rule. *See id.* If the Act applies to the Ensco-Centin agreement, then we must conclude that the choice of law provision and the defense and indemnity clause will be void as a matter of public policy. If the Act does not apply, then the defense and indemnity provision will be enforceable under either maritime law or Louisiana contract law. We therefore limit our analysis to whether the Act applies to the parties' agreement.

The Louisiana legislature adopted the Act to eliminate defense and indemnity provisions forced on Louisiana oilfield contractors. *See* LA. REV. STAT. ANN. § 9:2780(A). "The purpose of the legislator, and thus the policy interest of the state, is to protect certain contractors, namely those in oilfields, from being forced through indemnity provisions to bear the risk of their principal's negligence." *Rodrigue*, 563 So.2d at 254. Subsection C explains the agreements to which the Act applies:

> The term "agreement," as it *pertains to* a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in this Section, means any agreement or understanding, written or oral, concerning any operations *related to* the

---

(La. 1990). It is therefore unnecessary to apply Article 3537 to this case. *Cf. Roberts*, 104 F.3d at 786-87 (remanding the case to the district court in order for the court to compare the decision's effect on the public policies of Texas and Louisiana).

exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving, or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

La. Rev. Stat. Ann. § 9:2780(C) (emphasis added).

Given the Act's broad definition of "agreement," courts have construed Subsection C liberally. *See Roberts*, 104 F.3d at 784; *Copous v. Odeco Oil & Gas Co.*, 835 F.3d 115, 116 (5th Cir. 1988). Early cases achieved a considerably expansive application of the Act by focusing solely on Subsection C's "related to" language. In *Livings v. Service Truck Lines of Texas, Inc.*, 467 So.2d 595 (La. App. 3 Cir. 1985), the court of appeals applied the Act to an agreement involving a contractor's inspection of pipe. At the time of the inspection, the pipe was part of the owner's inventory and was not designated to any specific well. *See id.* at 598. The court concluded that the Act applied to the agreement even though the

services were not rendered in connection to a well. *See id.* at 599. The court reasoned that Subsection C only required the agreement to relate to the "'exploration, development, production, or transportation of oil, gas or water.'" *Id*. (quoting LA. REV. STAT. ANN. § 9:2780(C)).

Similarly, in *Day v. J. Ray McDermott, Inc.*, 492 So.2d 83 (La. App. 1 Cir. 1986), the court of appeals applied the Act to void a hold harmless agreement between two contractors. Gulf Oil Company hired J. Ray McDermott, Inc. to construct an offshore drilling platform in McDermott's yard in Amelia, Louisiana. *See id*. at 84. Gulf also hired Ultrasonic Specialists, Inc. to inspect the welds made by McDermott's employees. *See id*. Before allowing the Ultrasonic employees onto the premises, McDermott required Ultrasonic to execute a hold harmless agreement. *See id*. McDermott argued that the contract relating to the construction of an offshore platform was too remote in relation to drilling oil. *See id*. at 87. The court dismissed this argument, concluding that Subsection C only required the agreement to relate to a "'structure intended for use in the exploration for or production of any mineral.'" *Id*. at 88 (quoting LA. REV. STAT. ANN. § 9:2780(C)).

The scope of the Act's application diminished as a result of this Court's ruling in *Transcontinental Gas Pipe Line Corp. v. Transportation Insurance Company*, 953 F.2d 985 (5th Cir. 1992). In *Transcontinental*, we recognized that Subsection C requires not only that an agreement relate to the broad list of exploration, production, and transportation activities, but also that an agreement pertain to an actual well. *See id*. at 991. The opinion explained the application of Subsection C as a two-part test:

First, there must be an agreement that "pertains to" an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. Only if we determine that the contract has the required nexus to a well may we proceed to the second step of the process, examination of the contract's involvement with "operations related to the exploration, development, production, or transportation of oil, gas, or water." . . . Therefore, if (but only if) the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement.

*Id*. at 991. The above inquiry requires a fact intensive case by case analysis. *See id*. at 994.[4]

---

[4]We set forth the following non-exclusive list of factors relevant to the analysis:

(1) whether the structures or facilities to which the contract applies or with which it is associated, e.g. production platforms, pipelines, junction platforms, etc., are part of an in-field gas gathering system;

(2) what is the geographical location of the facility or system relative to the well or wells;

(3) whether the structure in question is a pipeline or is closely involved with a pipeline;

(4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities;

(5) whether the pipeline is a main transmission or trunk line;

(6) what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;

(7) what is the purpose or function of the facility or structure in question;

(8) what if any facilities or processes intervene between

8

The Louisiana Supreme Court adopted the *Transcontinental* test in *Fontenot v. Chevron U.S.A. Inc.*, 676 So.2d 557, 564 (La. 1996). Federal and state courts have continued to limit the application of the Act to service contracts that pertain to wells. The decisive factor in most cases has been the functional nexus between an agreement and a well or wells. *See, e.g.*, *Roberts*, 104 F.3d at 784–85 (holding that a work order pursuant to a master service contract pertained to a well because the work order involved a safety system, which helped sustain the manpower needed to operate specific wells); *Broussard v. Conoco, Inc.*, 959 F.2d 42, 45 (5th Cir. 1992) (holding that a catering contract that provided services to workers on an offshore platform helped sustain the manpower needed to operate the wells and therefore pertained to the wells); *Palmour v. Gray Ins. Co.*, 731 So.2d 911, 914 (La. App. 5 Cir. 1999) (concluding that a rental agreement for a crane did not pertain specifically to any well or wells). Other cases relied on the geographical nexus between the object of a service contract and offshore wells. *See, e.g.*, *Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429-30 (1996) (holding that a service contract pertained to a well because the contract involved work performed on a meter station connected to a well). Courts have not addressed whether an

the wellhead and the structure or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;
(9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;
(10) and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

*Transcontinental*, 953 F.2d at 995.

agreement for work on a dismantled drilling platform pertains to a well.

When a state's highest court has not decided an issue involving the application of state law, "it is the duty of the federal court to determine, as best it can, what the highest court of the state would decide." *Transcontinental*, 953 F.2d at 988. "Although we are not bound by state appellate court decisions, we will not disregard them 'unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id.* (quoting *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237 (1940)).

Centin argues that the holdings in *Livings*, *supra*, and *Day*, *supra*, should govern the outcome of this case. In each case, the state appellate court determined that the Act applied to service contracts for work on drilling equipment. *See Livings*, 467 So.2d at 599; *Day*, 492 So.2d at 88. The equipment in each case was located on the owner's property and was not associated with any particular well or wells. The courts concluded that the Act negated the indemnity provisions in the parties' contracts because the contracts related to exploration, development and production of oil and gas. Both *Livings* and *Day* were decided prior to this Court's opinion in *Transcontinental*, and hence did not assess whether the agreements pertained to a particular well. Because Louisiana courts have uniformly adopted the two-part test set forth in *Transcontinental*, we find *Livings* and *Day* unpersuasive to the extent the courts did not address whether the agreements in question pertained to a well. *See Fontenot*, 676 So.2d at 564; *Palmour*, 731

10

So.2d at 914; *Ridings v. Danos & Curole Marine Contractors*, 723 So.2d 979, 983 (La. App. 4 Cir. 1998).[5]

Turning to the application of the *Transcontinental* test to the Ensco-Centin agreement, we first assess whether the agreement pertained to a well. We focus specifically on the purchase and work orders associated with Centin's work on the Ensco 23. *See Roberts*, 104 F.3d at 784 n.3. *See Transcontinental*, 953 F.2d at 991. The following *Transcontinental* factors are relevant to the inquiry: (1) whether the structures or facilities to which the contract applies are part of an in-field gas gathering system; (2) the geographical location of the facility or system relative to the well or wells; (3) the function of the facility or structure in question; (4) who owns and operates the facility or structure in question and who owns and operates the well or wells; and (5) any number of other details affecting the functional and geographic nexus between a well and the structure or facility that is the object of the agreement. *See Broussard*, 959 F.2d at 45; *Transcontinental*, 953 F.2d at 994-95.

At the time Jesse Verdine and his Centin co-workers refurbished the Ensco 23, the platform sat idle in the Coral Marine fabrication

---

[5]In *Transcontinental*, we suggested that the holdings in *Livings* and *Day* support the position that a contract must pertained to a well. *See Transcontinental*, 953 F.2d at 992. This passing observation has led to some confusion among commentators. *See* Edward S. Johnson & Cindy T. Matherne, *Statutory and Contractual Indemnification and Forum Selection, Including the Oil Patch*, 24 TUL. MAR. L.J. 85, 110-11 (1999). In fact, the contracts in these cases did not pertain to a well. *See Livings*, 467 So.2d at 599; *Day*, 492 So.2d at 84, 88. Our suggestion in *Transcontinental* was dicta, and after a more thorough analysis, we conclude that the holdings in *Livings* and *Day* do not support the position that an agreement must pertain to a well.

11

yard.  The Ensco 23 was not participating in in-field exploration, production, or transportation of oil or gas.  Based on these facts alone, it is difficult to find a sufficient geographical and functional nexus between the Ensco 23 and a well or wells.

The "related to" component of Subsection C includes agreements relating to "services in connection  with . . . any structure intended for use in the exploration for or production of any mineral . . .."  LA. REV. STAT. ANN. § 9:2780(C).  The Louisiana legislature clearly envisioned the Act's application to agreements for services on structures that were not developing, producing or transporting oil or gas or geographically connected to a specific well.  We do not interpret the legislature's requirement that an agreement pertain to a well in such a restrictive manner that we overlook agreements to which the Act was intended to apply.  The Act encompasses agreements for services on structures intended for use in the oil and gas industry, so long as the agreement pertains to a well or wells.

The district court concluded that the agreement pertained to a well because Ensco negotiated a separate agreement with Amerada in which Amerada reserved the Ensco 23 for six of its wells off the coast of Louisiana.  While the Ensco 23 was not involved in exploration and production activities at the time Centin performed its contract obligations, the platform was designated for use on particular wells.  Centin's services were performed on a structure intended for use in the exploration and production of oil and gas.  Based on these facts, we conclude that the Ensco-Centin agreement pertained to specific wells and that the agreement related to the exploration, development, production, or transportation of oil, gas, or water.

12

### III.

The Louisiana Oilfield Anti-Indemnity Act therefore applies to the Ensco-Centin agreement. Both the choice-of-law provision and defense and indemnity clause are void and unenforceable under the Act. *See* LA. CIV. CODE ANN. art. 3540. The judgment of the district court is AFFIRMED.