# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 24, 2016

No. 15-30446

Lyle W. Cayce
Clerk

TETRA TECHNOLOGIES, INCORPORATED; MARITECH RESOURCES, INCORPORATED,

    Plaintiffs - Appellees

v.

CONTINENTAL INSURANCE COMPANY,

    Defendant - Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and REAVLEY, and DAVIS, Circuit Judges.

PER CURIAM:

Defendant-Appellant Continental Insurance Co. ("Continental") appeals the district court's final judgment in favor of Plaintiffs-Appellees Tetra Technologies, Inc. ("Tetra") and Maritech Resources, Inc. ("Maritech"), requiring Continental and its co-defendant insured, Vertex Services ("Vertex"), to indemnify them.[1] For the reasons set out below, we affirm in part, reverse in part, and remand.

---

[1] Although Vertex is a co-defendant with Continental, and the outcome concerns both Continental and Vertex, only Continental filed the motions for summary judgment and brought both appeals.

No. 15-30446

## I.     Background

This dispute arises from injuries sustained by a platform worker, Abraham Mayorga, employed by Vertex. Mayorga sued Tetra and Maritech (hereinafter collectively "Tetra" unless separately identified) for personal injury, and Tetra sought indemnity from Vertex and its insurer, Continental, pursuant to certain agreements and an insurance policy. On cross motions for summary judgment, the district court concluded that Tetra is entitled to indemnity from Continental and Vertex. Continental appeals.

### A.     Facts

Tetra and Vertex entered into a Master Service Agreement (the "MSA"), under which Vertex's employees would perform work for Tetra. The MSA required Vertex to indemnify Tetra for injuries sustained by Vertex's employees while working for Tetra. Pursuant to the MSA, Vertex was also required to list Tetra as an additional insured under its general liability insurance policy issued by Continental (the "Policy").

Tetra entered into an agreement (the "Salvage Plan") with Maritech to salvage a decommissioned oil production platform located at Eugene Island 129 ("EI129"). Tetra retained Vertex to perform at least some aspects of the salvage operation. Mayorga served as a rigger for the project, working from a Tetra-owned barge, the *D/B Arapaho*. On May 22, 2011, Mayorga was assigned to assist in removing a bridge connecting two sections of the EI129 platform. In his complaint, Mayorga alleged that he was injured when the bridge collapsed, causing him and other workers on it to fall 70–80 feet into the Gulf of Mexico. Mayorga filed suit against Tetra, alleging that it had been negligent in performing the salvage operation.

### B.     Procedural History

Tetra filed this indemnity action against Vertex and Continental. Tetra

2

No. 15-30446

and Continental filed cross motions for summary judgment. Continental asserted that it was not required to indemnify Tetra, because (1) the Outer Continental Shelf Lands Act ("OCSLA") made Louisiana law applicable as surrogate federal law; (2) the indemnity agreement was void under the Louisiana Oilfield Indemnity Act ("LOIA"); and (3) in any event, Tetra's claims were excluded under Exclusion d of the Policy. Tetra argued that neither LOIA nor the Policy precluded recovery against Continental or Vertex. On the initial cross motions for summary judgment, the district court found that Continental and Vertex are required to indemnify Tetra because LOIA did not apply and that Exclusion d did not preclude coverage. Continental appealed, but that appeal was dismissed for lack of jurisdiction.

On remand, the parties entered stipulations as to the two issues that prevented resolution of the prior appeal. Tetra also claimed that it was entitled to additional attorneys' fees, while Continental re-urged its motion for summary judgment. The district court denied both Tetra's motion for additional fees (which Tetra does not appeal) and Continental's re-urged motion for summary judgment, entering a final judgment against Continental and Vertex. Continental appeals the grant of summary judgment in favor of Tetra and the denial of its own motion for summary judgment.

## II.    DISCUSSION

This court "review[s] the district court's judgment on cross motions for summary judgment de novo, addressing each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[2]

Because the dispute in this case stems from events that occurred in the

---

[2] *Morgan v. Plano Ind. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009).

3

No. 15-30446

Gulf of Mexico above the outer Continental Shelf ("OCS"), OCSLA applies.[3] Under OCSLA, federal law generally applies to such disputes and state law is applied "only as federal law and then only when not inconsistent with applicable federal law."[4] When there are "gaps in the federal law,"[5] OCSLA adopts the law of the adjacent state, here Louisiana, as surrogate federal law "[t]o the extent that [the adjacent state's law is] applicable and not inconsistent with [OCSLA] or with other Federal laws and regulations."[6]

OCSLA is important to this dispute because Continental contends that LOIA applies as surrogate federal law and voids the MSA's indemnity agreement. LOIA renders void, under certain conditions relating generally to the petroleum industry, any agreement that purports to indemnify a party for damages resulting from death or bodily injury caused by the indemnitee's own negligence or fault.[7] If LOIA voids the indemnity agreement, then Tetra is not entitled to indemnity from Continental or Vertex. If LOIA does not void the indemnity agreement, however, then we must determine whether the Continental Policy itself excludes coverage.

Accordingly, we must address three issues: (1) whether OCSLA requires the court to adopt Louisiana law as surrogate federal law; (2) if (or assuming, as did the district court) Louisiana law must be adopted as surrogate federal law, whether LOIA voids the indemnity agreement here; and (3) if LOIA does not void the indemnity agreement, whether the Policy excludes coverage.

---

[3] *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355–56 (1969) ("The purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as those . . . on the outer Continental Shelf.").

[4] *Id.*

[5] *Id.* at 356.

[6] 43 U.S.C. § 1333(a)(1), (a)(2)(A); *see also Rodrigue*, 395 U.S. at 356–57; *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 560 (5th Cir. 2003) ("[T]he law applicable is federal law, supplemented by state law of the adjacent state." (internal quotation marks omitted)).

[7] La. Rev. Stat. Ann. § 9:2780(A).

No. 15-30446

## A. The Summary Judgment Record Is Inadequate To Determine Whether OCSLA Requires The Adoption Of Louisiana Law As Surrogate Federal Law.

### 1. Applicable Law

"Under *Union Texas Petroleum Corp. v. PLT Engineering, Inc.* [("*PLT*")], three requirements must be met for state law to apply as surrogate federal law under the OCSLA."[8] First, "[t]he controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed, or artificial structures permanently or temporarily attached thereto)."[9] Second, "[f]ederal maritime law must not apply of its own force."[10] Third, "[t]he state law must not be inconsistent with Federal law."[11]

### 2. We Cannot Determine Whether There Is an OCSLA Situs.

Under the first requirement of the *PLT* test, "the controversy at issue must arise on an OCSLA situs, namely the seabed, subsoil, and fixed structures of the outer Continental Shelf."[12] When dealing with contractual disputes, this circuit applies a focus-of-the-contract test to determine whether a controversy arises on an OCSLA situs.[13] Under the focus-of-the-contract test, "a contractual indemnity claim (or any other contractual dispute) arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A)."[14]

---

[8] *ACE Am. Ins. Co. v. M-I, L.L.C.*, 699 F.3d 826, 830 (5th Cir. 2012).

[9] *PLT*, 895 F.2d 1043, 1047 (5th Cir. 1990).

[10] *Id.*

[11] *Id.*

[12] *ACE Am. Ins. Co.*, 699 F.3d at 830.

[13] *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 (5th Cir. 2009) (en banc).

[14] *Id.* at 787–88.

No. 15-30446

As this court has discussed, "it is a common practice for companies contracting for work in the oilfield to enter into contracts in two stages," first signing a blanket contract and then "issu[ing] work orders for the performance of specific work."[15] Here, Tetra and Vertex followed this common practice: first entering into the MSA, which functions as a "blanket agreement" between the parties, and then Tetra issuing specific work orders for the completion of particular tasks. In a situation "where the contract consists of two parts, a blanket contract followed by later work order, the two must be interpreted together."[16] But generally, "in determining situs in a contract case such as this, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract."[17]

Continental argues that the evidence in the record—namely the MSA, the Salvage Plan, and Mayorga's deposition testimony—establishes that the controversy arose on an OCSLA situs. Continental also asserts that the "entire goal" of the work Tetra hired Vertex to perform was the deconstruction, decommissioning, and salvaging of parts of the platform on the OCS. Tetra counters that there is no record evidence as to where the majority of Vertex's work for Tetra was to be performed but contends that most of the work was to be performed on lift barges and material barges—not on an OCS platform.

Tetra's specific work order to Vertex that resulted in Mayorga's assignment to the job is absent from the record. However, the absence of a specific work order is not fatal to Continental's assertion that the controversy arose on an OCSLA situs.[18] Here, the primary non-contractual evidence was

---

[15] *Grand Isle*, 589 F.3d at 787 n.6 (citing *Davis & Sons v. Gulf Oil Corp.*, 919 F.2d 313, 315–17 (5th Cir. 1990)).

[16] *Grand Isle*, 589 F.3d at 787 n.6 (internal quotation marks omitted).

[17] *Id.*

[18] *See ACE Am. Ins. Co.*, 699 F.3d at 831 (noting that service tickets and time sheets

No. 15-30446

Mayorga's deposition testimony. In his deposition, Mayorga testified that he worked as a rigger for Vertex and that he had been on the barge where the accident occurred for two years. Much of Mayorga's work-specific testimony focused on his actions the night of the accident and does reveal that Mayorga worked extensively on the fixed platform. However, as the district court concluded, it is difficult to extrapolate Mayorga's testimony to determine the scope of the entire work order.

Continental also points to the MSA to show that the controversy arose on an OCSLA situs. However, the terms of the MSA provide little guidance in helping to determine where the majority of the work was to be performed under the contract. Instead, the MSA merely states that Tetra may "obtain certain services [from Vertex], including but not limited to, inspection, maintenance, fabrication, surveying, diving, repair and/or other general oilfield services." Thus, the MSA does not show that Vertex's work was to be performed on the platform.

Finally, Continental argues that the Salvage Plan is "especially relevant" in determining where the majority of the work was to be completed. First, the Salvage Plan is captioned "Bridge and Bridge Support Salvages, Eugene Island 129 Complex." Next, the work described in the Salvage Plan does largely relate to the EI129 platform. For example, a barge was to be set up at the EI129 Complex and attached to the EI129 platform, and the removed bridges were, of course, on the EI129 Complex and platform. Based on these descriptions of the work and the plan itself, Continental contends that every portion of the work to be completed was located at, adjacent to, or on the platform on the outer Continental Shelf.

The problem with Continental's argument is that the Salvage Plan

could provide evidence of the location where work was to be performed).

7

explains the work that Tetra was to perform for Maritech. As the district court observed, the Salvage Plan contains no information related to what services Tetra retained Vertex to perform. While Mayorga was injured deconstructing a bridge platform on the EI129 complex, it does not follow that the majority of Vertex's work was performed in that location. Rather, that one "snapshot" does not explain what the entire work order might have contemplated. In fact, the Salvage Plan itself (which relates to the work Tetra would perform for Maritech) also describes a number of tasks that would be performed on the barge—not on the platform.

Viewing Mayorga's deposition testimony, the MSA, and the Salvage Plan together does suggest that much of Tetra's work was to be performed on the EI129 platform. The relevant question, however, is where a majority of Vertex's performance was to occur under the contract, as the district court explained.[19] The record does not definitively answer that question. Though Continental contends that "Tetra hired Vertex employees to perform the Salvage Plan," there are a number of aspects of that Salvage Plan that were not to be performed on the EI129 platform. Further, the MSA provides no guidance, and Mayorga's testimony and allegations do not establish the scope of the services for which Tetra retained Vertex. In sum, we conclude that neither party is entitled to judgment as to *PLT*'s first prong: whether the controversy arose on an OCSLA situs.

### 3. We Cannot Determine Whether Federal Maritime Law Applies.

Under *PLT*'s second requirement, in order for the OCSLA choice of law provision to apply, "[f]ederal maritime law must not apply of its own force."[20]

---

[19] *Grand Isle*, 589 F.3d at 787.
[20] *PLT*, 895 F.2d at 1047.

No. 15-30446

"Determining whether maritime law applies of its own force involves a two-step inquiry—first, an examination of the historical treatment of contracts of that type in the jurisprudence and second, a six-factor 'fact-specific' inquiry into the nature of the contract."[21] The court "must analyze whether the particular work order . . . is maritime in nature."[22] This court

> consider[s] six factors in characterizing the contract: 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?[23]

Continental argues that *PLT*'s second prong is met because the work at issue involved decommissioning, deconstructing, or salvaging a fixed platform used for oil and gas exploration on the OCS. Such contracts are not "historically treated" as maritime contracts, and maritime law thus generally would not apply of its own force.[24] The flaw in Continental's argument, as was the case under *PLT*'s first prong, is the paucity of summary judgment evidence. There is little evidence to guide an analysis of "whether the particular work order" was maritime—and of course, the work order itself is absent from the record.

Continental points out that work primarily performed on a fixed platform is not maritime in nature. While true, Continental's overstates what

---

[21] *ACE Am. Ins. Co.*, 699 F.3d at 831.

[22] *Id.* at 832.

[23] *Davis & Sons, Inc.*, 919 F.2d at 316.

[24] *See Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 352 (5th Cir. 1999) ("Construction work on fixed offshore platforms bears no significant relation to traditional maritime activity."); *see also ACE Am. Ins. Co.*, 699 F.3d at 832 (holding that maritime law did not apply of its own force where "the relevant contract . . . was performed on a stationary platform"); *Grand Isle*, 589 F.3d at 789 (agreeing with the district court's conclusion that contract, "which called for maintenance work on a stationary platform located on the OCS," was not a maritime contract).

can be gleaned from the Salvage Plan. That agreement between Tetra and Maritech does relate in large part to a fixed platform. However, there are aspects of the Salvage Plan that would not be performed on the EI129 platform.

Moreover, the critical question is the nature of the contract between Tetra and Vertex. There appears to be no evidence that Tetra hired Vertex *solely* to perform the Salvage Plan for Maritech, nor any evidence that Vertex's performance related to only, or even mostly, platform-specific tasks. Because the scope of the work Vertex performed for Tetra is unclear, we may not say whether the "particular work order" was maritime or non-maritime in nature.

The only *Davis* factor for which there is clear record evidence is the sixth—the work the injured worker was actually doing at the time of injury. Here, Mayorga was assisting in removing a bridge connecting two platforms at the EI129 complex. The evidence is insufficient or inconclusive as to the other five factors.

As to the first two factors—the nature of the specific work order and the actual work done by the crew—the evidence is inconclusive as to whether the contract was non-maritime. Continental relies on the Salvage Plan, Mayorga's deposition testimony, and the complaints filed in the underlying lawsuit, but those sources do not describe the nature of the entire work order. They merely show the work that Mayorga and others were performing at the time.

Continental faces a similar problem with the third, fourth, and fifth factors—the relationship to a navigable vessel, the nature of the actual work, and the injured worker's primary work. Continental concedes that Mayorga partially worked on the *D/B Arapaho* but contends that his actual work was not related to a vessel in navigation. Again, there is little evidence as to the total scope of Mayorga's duties.

In sum, we conclude that the evidence is insufficient to determine whether federal maritime law does not apply of its own force. Accordingly,

neither party is entitled to summary judgment on *PLT*'s second prong.

### 4.     LOIA Is Consistent with Federal Law.

Finally, under *PLT*'s third prong, "[t]he state law must not be inconsistent with Federal law."[25] Nothing in LOIA is inconsistent with federal law,[26] and Tetra does not argue otherwise.[27] Thus, we conclude that *PLT*'s third prong is satisfied.

### 5.     In Sum, We Must Remand On The OCSLA Issue.

Because the summary judgment evidence is insufficient to determine the first two *PLT* prongs, neither party is entitled to summary judgment as to whether LOIA must be adopted as surrogate federal law under OCSLA. That was not a problem under the district court's analysis because it concluded that if Louisiana law did apply, LOIA would not void the indemnity agreement under these circumstances, and if Louisiana law did not apply, the Policy would not exclude coverage. Because the outcome would be the same either way under the district court's interpretation, it was unnecessary for it to resolve the OCSLA issue. Because, as explained below, we conclude below that LOIA *would* void the indemnity agreement but the Policy itself would not exclude coverage, we remand for the district court to determine the now dispositive issue of whether Louisiana law must be adopted as surrogate federal law.

---

[25] *PLT*, 895 F.2d at 1047.

[26] *See Grand Isle*, 589 F.3d at 789 (agreeing with district court's conclusion that this court "has specifically held that nothing in LOIA is inconsistent with federal law" (internal quotation marks and citation omitted)).

[27] *See Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir. 2006) ("By not contesting [plaintiff's] arguments that [*PLT*'s second and third requirements] are satisfied, B.P. implicitly concedes that those conditions have been met.").

## B.     LOIA Would Void the Indemnity Agreement.

### 1.     Applicable Law

If OCSLA requires the adoption of Louisiana law as surrogate federal law, the next question is whether LOIA applies to this dispute. LOIA provides, in relevant part:

A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some *agreements pertaining to wells* for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

B. Any provision *contained in, collateral to, or affecting an agreement pertaining to a well* for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C. The term "agreement," as it pertains to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in this Section, means any agreement or understanding, written or oral, *concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including but not limited to drilling, deepening, reworking, repairing, improving,*

*testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well . . . .*

. . .

G. Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section of the Louisiana Revised Statutes of 1950 *which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection* which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.[28]

Thus, if LOIA applies, it will void not only Vertex's indemnity obligation but also Continental's insurance obligation under the Policy to Tetra as an additional named insured.

This court has adopted a two-part test to determine if LOIA applies. "First, there must be an agreement that 'pertains to' an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends."[29] In determining whether an agreement pertains to a well, "[t]he decisive factor in most cases has been the functional nexus between an agreement and a well or wells."[30]

If the agreement "has the required nexus to a well," the court examines "the contract's involvement with operations related to the exploration, development, production, or transportation of oil, gas, or water."[31] Thus, "if (but only if) the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement."[32] This inquiry "requires a fact intensive case by case

---

[28] La. Rev. Stat. Ann. § 9:2780 (emphasis added).

[29] *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992).

[30] *Verdine v. Ensco Offshore Co.*, 255 F.3d 246, 252 (5th Cir. 2001).

[31] *Transcon. Gas*, 953 F.2d at 991 (internal quotation marks omitted).

[32] *Id.*

analysis."[33]

### 2. **Analysis**

Although the inquiry is usually fact intensive, the question before us here is one of law. The district court seems to have concluded that the salvage of a fully decommissioned production platform does not have the "required nexus to a well" because the well is not in use. Thus, the question before us is whether salvaging a decommissioned platform has a sufficient nexus to a well for LOIA to apply.

Continental contends that this court's decision in *Verdine,* which considered the extent of LOIA's nexus to a well requirement, shows the district court's error. There, Ensco agreed to provide a fixed platform rig to Amerada Hess Corporation for use on wells located off the Louisiana coast.[34] Specifically, before the platform rig could be used, it required "extensive refurbishment work," which Ensco retained Centin to perform at its onshore fabrication yard.[35] The court observed that "[c]ourts have not addressed whether an agreement for work on a dismantled drilling platform pertains to a well."[36]

The court first noted that at the time Centin's employees worked on the platform, it sat idle in a fabrication yard and "was not participating in in-field exploration, production, or transportation of oil or gas."[37] Such facts made it "difficult to find a sufficient geographical and functional nexus between the [platform] and a well or wells."[38] However, "while [the platform] was not involved in exploration or production activities at the time Centin performed its contract obligations, the platform was designated for use on particular

---

[33] *Verdine*, 255 F.3d at 251.

[34] 255 F.3d at 248–49.

[35] *Id.*

[36] *Id.* at 252–54.

[37] *Id.* at 253.

[38] *Id.*

wells."[39] In other words, the platform had been used on active wells before and would again be used on active wells following refurbishment. Refusing "to interpret the legislature's requirement that an agreement pertain to a well in such a restrictive manner that we overlook agreements to which the Act was intended to apply," the court found the requisite nexus to a well because the services "were performed on a structure intended for use in the exploration and production of oil and gas."[40]

Continental argues that under *Verdine*, a platform salvaging operation has the required nexus to a well. This court has not yet considered the extent of *Verdine*'s holding, and *Verdine* itself does not answer this question. The *Verdine* court found it "difficult to find a sufficient geographical and functional nexus between the [platform] and a well or wells" where the platform was not being used for in-field exploration, production, or transportation and instead was sitting idle.[41] Instead, the court concluded that the agreement had a sufficient nexus to a well once it considered the additional fact that the "platform was designated for use on particular wells," namely six particular wells located off the Louisiana coast.[42] That is, *Verdine* suggests that the sufficient nexus to a well arose because the platform was being refurbished for use in future oil exploration.[43]

That does not end our inquiry, however. Continental argues that salvaging a platform from a decommissioned well necessarily has the required

---

[39] *Id.* at 254.

[40] *Id.*

[41] 255 F.3d at 253.

[42] *Id.* at 253–54.

[43] *See Labove v. Candy Fleet, L.L.C.*, No. 11-1405, 2012 WL 3043168, at *6 (E.D. La. July 20, 2012) (characterizing *Verdine* as "holding that a contract for repairs on a dismantled fixed oil platform rig pertained to a well because services rendered were performed on a structure intended for *future use* in the exploration and production of oil and gas" (emphasis added)).

nexus to a well, relying on district court cases that have interpreted *Verdine* broadly: *Wilcox v. Max Welders, L.L.C.*,[44] *Howell v. Avante Servs., LLC*,[45] *Teaver v. Seatrax of La.*[46]

*Howell* involved an agreement to cut and pull casings from the wellbores on an oil platform as part of a plan to "plug and abandon" the oil well.[47] The plaintiff argued that the agreement did not relate to a well because the well was not functioning at the time of performance.[48] The district court disagreed, first observing that removing the casings from the wellbore was "collateral to plugging the well" and covered under a straightforward reading of LOIA.[49] Further, "the purpose of the casings was to assist in oil and gas production."[50] The district court also rejected the plaintiff's argument that "where a structure is no longer involved in or capable of hydrocarbon production, an agreement for services pertaining to that structure is *not* an agreement that pertains to a well."[51] Instead, applying *Verdine*, the court held that such a restrictive reading "would exclude plugging and activities collateral to plugging," which LOIA expressly covers.[52] The court also observed that removing the casings could not be "logically severed from the overall plug and abandonment operation."[53] Thus, the district court concluded that the agreement pertained to a well.[54]

Similarly, in *Teaver*, the plaintiffs argued that the relevant agreement

---

[44] 969 F. Supp. 2d 668, 680–83 (E.D. La. 2013).
[45] Nos. 12-293 & 12-2448, 2013 WL 1681436, at *3–7 (E.D. La. Apr. 17, 2013).
[46] No. 10-1523, 2012 WL 5866042, at *4–5 (E.D. La. Nov. 19, 2012).
[47] 2013 WL 1681436, at *1, *4.
[48] *Id.* at *4.
[49] *Id.*
[50] *Id.* at *5.
[51] *Id.*
[52] *Id.* at *6.
[53] *Id.* at *8.
[54] *Id.* at *6.

did not pertain to a well because the work related to dismantling a platform crane and because the well itself had been dry for several years.[55] Observing that the crane was used "to assist with the plugging and abandoning of the wells," the *Teaver* court found "that the scope of the agreement necessarily pertains to the wells."[56] The court rejected the plaintiffs' argument that the nexus to a well was negated because the wells were non-producing and the platform was thus not an in-field production platform.[57] Relying on *Verdine*, the court concluded that the "wells had previously produced oil and the platform had previously been an in-field production platform." Further, because the crane was used in plugging the well, it fell within the scope of LOIA's broad language.[58]

In *Wilcox*, the district court found that an agreement to, *inter alia*, "provide welding services in connection with the decommissioning of oil and gas platforms" pertained to a well because it was an "agreement to perform an act that is collateral to plugging the well."[59] The court observed that the platforms were part of the well production system, assisted in oil and gas production, had a geographic nexus to the well, and had a functional nexus because they provided the "physical structure that housed and protected the well conductor."[60] The defendants, however, argued that "[w]here there is no functional or geographic nexus between a live well and the structure in question," LOIA does not apply.[61] Relying heavily on *Howell* and *Verdine*, the *Wilcox* court rejected this argument.[62] Instead, the court noted that the

---

[55] 2012 WL 5866042, at *2.

[56] *Id.* at *4–5.

[57] *Id.* at *5.

[58] *Id.*

[59] 969 F. Supp. 2d at 682–84 (internal quotation marks omitted).

[60] *Id.* at 682.

[61] *Id.*

[62] *Id.*

platform at issue in *Verdine* was already decommissioned but was still found to be related to a well.[63]

We conclude that these cases properly interpret LOIA. Each case involved agreements to perform work in connection with "plugging and abandoning" the wells at issue. Accepting the argument that LOIA could never apply to a nonproducing well would have required the district courts to interpret LOIA in such a manner as to exclude an expressly covered activity.[64] Those district courts were certainly correct to reject such a restrictive view.

Tetra argues that this case is distinguishable because the wells at issue were decommissioned long before the Salvage Plan came into effect. Tetra asserts that salvaging a decommissioned platform is not collateral to plugging or decommissioning the well but is effectively one step further removed. We reject that argument because it ignores the fact that regulations generally require the removal of an oil platform in connection with a decommissioning operation.[65]

Based on all the above, we conclude that a contract for salvaging a platform from a decommissioned oil well has a sufficient nexus to a well under LOIA. Thus, LOIA would void Vertex's indemnity obligation as well as Continental's obligation to indemnity Tetra as an additional insured. Consequently, if the district court determines on remand that Louisiana law must be adopted as surrogate federal law, Tetra will not be entitled to indemnity from Continental or Vertex. If the district court instead determines that Louisiana law does not apply, then the outcome depends on whether the

---

[63] *Id.* at 682–83.

[64] *See* La. Rev. Stat. Ann. § 9:2780(C) (including plugging or "any act collateral thereto" as activities pertaining to a well).

[65] *See* 30 C.F.R. § 250.1703 (listing general requirements for decommissioning) ("When your facilities are no longer useful for operations, you must . . . [r]emove all platforms and other facilities, except as provided in §§ 250.1725(a) and 250.1730. . . .").

No. 15-30446

Policy itself excludes coverage.

## C.    The Policy Does Not Exclude Coverage.

### 1.    Applicable Law

"Texas courts interpret insurance policies according to the rules of contract construction."[66] This court "evaluate[s] the contract based on its plain meaning, determining what the words of the contract say the parties agreed to do."[67] The court "must examine the policy as a whole, seeking to harmonize all provisions and render none meaningless."[68]

"If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous,"[69] and the court must "construe [the policy] as a matter of law and enforce it as written."[70] "An ambiguity does not exist . . . simply because the parties interpret a policy differently."[71] Instead, a policy is ambiguous "if the contractual language is susceptible to two or more reasonable interpretations."[72] Ambiguous policy language—in particular, exclusionary language—must be construed "strictly against the insurer and liberally in favor of the insured."[73] "If the insured's construction of an ambiguous exclusionary provision is reasonable, the court must adopt it, even if it is not the most reasonable position."[74]

---

[66] *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 199 (5th Cir. 2012) (quoting *de Laurentis v. U.S. Auto Ass'n*, 162 S.W.3d 714, 721 (Tex. App.—Houston [14th Dist.] 2005)).

[67] *Id.*

[68] *In re Deepwater Horizon*, 470 S.W.3d 452, 464 (Tex. 2015).

[69] *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010).

[70] *In re Deepwater Horizon*, 470 S.W.3d at 464.

[71] *Am. Home Assurance Co. v. Cat Tech L.L.C.*, 660 F.3d 216, 220 (5th Cir. 2011).

[72] *Rentech Steel*, 620 F.3d at 562 (internal quotation marks omitted).

[73] *Id.* at 563–64; *see also Likens*, 688 F.3d at 199.

[74] *Likens*, 688 F.3d at 199.

## 2.    The Relevant Policy Language

Exclusion d, at issue here, provides:

2. Exclusions
This insurance does not apply to: . . .

d. Any obligation of the insured under a workers compensation, United States Longshoremen's and Harbor Workers' Compensation Act, Jones Act, Death on the High Seas Act, General Maritime Law, Federal Employers' Liability Act, disability benefits or unemployment compensation law or any similar law. . . .

The district court found that Exclusion d is ambiguous because it is subject to multiple reasonable interpretations. Specifically, the district court concluded that Exclusion d is ambiguous because of: (1) the "any similar law" language; (2) the limiting clause in another provision, Exclusion e; and (3) the seeming illusoriness of coverage under Continental's interpretation. We conclude that Exclusion d is ambiguous because of the "any similar law" language.

As the district court observed, the inclusion of the phrase "any similar law" prompts the court to ask how the enumerated laws are similar. Tetra argues that each of the enumerated laws in Exclusion d contains elements of employers' liability, so "any similar law" should be reasonably read to refer to employers' liability. We agree that the employer/employee relationship is the "similar" thread throughout each enumerated law.[75] We also conclude that Continental's construction of Exclusion d, which would apply it to a general tort claim, renders the policy ambiguous.

Continental argues on appeal that the laws contained in Exclusion d are not merely employers' liability laws. Specifically, Continental contends that

[75] Notably, Exclusion d is phrased in a similar manner as most "workers' compensation" or similar exclusions. *See* 9 Couch on Ins. § 129:11 (3d ed. 2015).

the Policy excludes Tetra's coverage because Mayorga's complaint for damages invoked "General Maritime Law," and Exclusion d explicitly includes the phrase "General Maritime Law." Though superficially plausible, that argument is inadequate. We are required to "examine the policy as a whole, seeking to harmonize all provisions and render none meaningless."[76] Continental's construction fails to account for the phrase "any similar law" in Exclusion d, while Tetra's construction does account for it.

This court's decision in *Amerisure Insurance Co. v. Navigators Insurance Co.,* while not on all fours, also lends support to Tetra's argument that "any similar law" renders Exclusion d ambiguous.[77] In *Amerisure*, two workers sued for negligence under the Jones Act, and the insurer argued that the policy did not apply due to a provision excluding coverage for "[a]ny obligation for which the insured . . . may be held liable under any workers compensation, disability benefits or unemployment compensation law or any similar law."[78] This court observed that Jones Act claims are not similar to workers' compensation claims, because "the former is based on the employer's negligence while the latter is not."[79] Thus, "the operative phrase [in the insurance contract] . . . , 'any similar law,' is ambiguous with respect to the Jones Act claims."[80] The logic of *Amerisure* supports a finding of ambiguity here.

Because we find that Exclusion d's "any similar law" language suffices to render the exclusion ambiguous, we need not reach the two alternative or additional grounds for finding ambiguity, namely the effect of certain limiting language in Exclusion e, and whether or not Continental's construction of the Policy renders coverage illusory. "In light of this ambiguity, the court must

---

[76] *In re Deepwater Horizon*, 470 S.W.3d at 464.

[77] 611 F.3d 299 (5th Cir. 2010).

[78] *Id.* at 310.

[79] *Id.* at 310.

[80] *Id.*

interpret the [provision] so that it does not exclude coverage."[81] Accordingly, we conclude that the Policy does not exclude coverage. Thus, if the district court determines that Louisiana law does not apply under OCSLA, Tetra will be entitled to indemnity.

## III.   CONCLUSION

In sum, we REVERSE with respect to the district court's interpretation of LOIA, AFFIRM with respect to the Policy interpretation, and REMAND for a determination of whether Louisiana law applies as surrogate federal law under OCSLA. On remand, if the district court concludes that Louisiana law applies to this dispute, LOIA will void the indemnity agreement, and Continental and Vertex will be entitled to judgment. If the district court concludes that Louisiana law does not apply, then Tetra and Maritech will be entitled to judgment against Continental and Vertex because the Policy does not exclude coverage.

---

[81] *Amerisure Ins. Co.*, 611 F.3d at 310.