# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 13, 2018

Lyle W. Cayce
Clerk

No. 16-31214

In re: In the Matter of the Complaint of Crescent Energy Services, L.L.C., Owner and Operator of the S/B OB 808, for Exoneration from or Limitation of Liability

CRESCENT ENERGY SERVICES, L.L.C., as Owner and Operator of the S/B OB 808, for Exoneration from or Limitation of Liability

> Petitioner-Appellant

v.

CARRIZO OIL & GAS, INCORPORATED,

> Third Party Plaintiff - Appellee

v.

LIBERTY MUTUAL INSURANCE COMPANY, doing business as Liberty International Underwriters; STARR INDEMNITY & LIABILITY COMPANY,

> Third Party Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, SOUTHWICK, and COSTA, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

No. 16-31214

This appeal poses the question of whether a particular contract to plug and abandon three offshore oil wells is a maritime contract.  The answer matters because it determines where to place financial liability for injuries to an employee of the contractor performing the work.  Complicating the appeal is that after the district court ruled, this court altered the several decades-old test for determining whether such contracts were maritime or not.  Applying the new test to the facts that are not in dispute in this record, we AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Carrizo Oil & Gas, Incorporated, needed a contractor to plug and abandon three no longer producing wells located on small fixed platforms in coastal waters of Lafourche Parish, Louisiana.  State law obligated Carrizo to decommission these wells.  The parties, and so will we, refer to this activity as plugging and abandoning the wells, or "P&A work."  We once described such work this way: "Cement plugs are inserted into the wells beneath the ocean floor and the casing pipe is removed."  *St. Romain v. Indus. Fabrication & Repair Serv., Inc.*, 203 F.3d 376, 378 (5th Cir. 2000).[1]

Crescent Energy Services, LLC, an oil and gas industry contractor, submitted a bid for the work.  In the bid letter, Crescent noted that the equipment it would use included the "5K P&A Equipment Package," "5K Sand Cutting Casing Cutter Package," a five-person crew to perform the P&A work,

---

[1] The parties' briefing has given little attention to whether Crescent was contractually tasked with removal of the fixed platforms themselves.  Federal law requires removal to complete the decommissioning of a well on the Outer Continental Shelf.  *See Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 519 (5th Cir. 2010).  As to rules applicable to Louisiana's territorial waters, Carrizo refers us to state regulations which require operators to provide financial security for the eventual "site restoration" of plugged and abandoned wells.  *See* LA. ADMIN. CODE tit. 43 XIX, § 104A (2017).  Crescent's insurers cite Section 311 of Part IX of those regulations, which seem to require the removal of a production platform.  Whether it was Crescent's chore would depend on the contract.  Dismantling and salvaging the platform is not among the 13 tasks identified on a document entitled "P&A Procedure" discussed by both parties.

and three vessels. The vessels included a quarters barge with a thirty-foot long crane, called the "OB 808"; a tug boat named the "SLYE JOSEPH"; and a cargo barge. The OB 808 was a barge that could operate in shallow water where its spuds or footings would be anchored in the mud to create a stable platform. The OB 808 provided living quarters for the crew and operated as an additional platform for the P&A operations. The OB 808 spud barge required use of a tug boat because the barge was not motorized, and Crescent contracted with another entity for use of the SLYE JOSEPH.

Carrizo accepted Crescent's bid to plug and abandon the three wells, forming an agreement that we will refer to, because the parties do, as the Turnkey Bid. Those two companies already had an ongoing relationship under a Master Service Agreement, which provides general terms applicable to contracts between the parties "for the performance of work or the provision of services." Included were several paragraphs describing Crescent's obligation to indemnify Carrizo against any claims for bodily injury, death, or damage to property. The Turnkey Bid and the Master Service Agreement together formed Carrizo and Crescent's contract. A document detailing the P&A work breaks the tasks into thirteen steps.

On February 13, 2015, Crescent's employee Corday Shoulder was severely injured. Shoulder, a pump operator, was sitting on the fixed platform when he was injured. The district court described the event this way:

> Before the accident, Shoulder attached a piece of pipe to Carrizo's well and screwed the pipe into a flange. When Shoulder began releasing pressure from the well, the pipe separated from the flange, severely injuring Shoulder's leg.

In March 2015, Crescent filed a limitation of liability action in the United States District Court for the Eastern District of Louisiana. The suit was brought under Federal Rule of Civil Procedure 9(h) and Rule F of the Supplemental Rules for Admiralty and Maritime Claims, the latter rule

specifically governing maritime limitation of liability actions. Crescent asserted the seaworthiness of its vessel and its proper operation, disclaimed any negligence, identified the value of the vessel and offered security in that amount to the court, sought to require all who had claims arising out of the accident to file them in this suit, requested the enjoining of prosecution of claims elsewhere, and demanded exoneration from liability.

Carrizo in its answer rejected that Crescent had brought a valid limitation of liability action. It claimed the benefit of the insurance applicable to the incident, and also identified Crescent's agreement to indemnify it for claims such as these. Crescent and its insurers would deny that indemnity was owed despite the contractual language, arguing that Louisiana's Oilfield Anti-Indemnity Act applied. *See* LA. STAT. ANN. § 9:2780. As relevant here, that Act voids an agreement in a contract involving "a well for oil, gas, or water" which would require a contractor to indemnify its principal from the latter's own fault in causing death or bodily injury. *Id.*

Shoulder and Carrizo both filed claims along with their answers. Carrizo also filed claims against four companies that it alleged were Crescent's insurers. Of those, Liberty Mutual Insurance Company and Starr Indemnity & Liability Company are the only appellants here. Pursuant to an agreement with Carrizo, Crescent has been dismissed from the case. When referring collectively to the only appellants, we label them "Crescent's insurers."

The parties all filed for summary judgment. The district court granted Carrizo's motion and denied the others. The court relied on the provision in the Master Service Agreement in which Crescent agreed to indemnify Carrizo for injuries to Crescent employees. The court held that indemnification was enforceable against Crescent because the parties had entered a maritime contract. Such a contract made federal maritime law applicable and precluded

No. 16-31214

application of the Louisiana Oilfield Anti-Indemnity Act.  Crescent's insurers timely appealed.

## DISCUSSION

We have either one or two issues to resolve.  We know we must determine whether the relevant collection of agreements constitutes a maritime contract.  If so, general maritime law applies, and the indemnity provision in the contract is enforceable.

We are also urged by Crescent's insurers to decide an issue that was not presented to the district court.  That issue arises only if the contract in question is a maritime one.  We start with that issue, then turn to whether this is a maritime contract.

### A.  Inherently local disputes

The Supreme Court, in a decision central to our resolution of whether the contract in question was a maritime one, observed preliminarily that even when maritime law would otherwise apply, some disputes could be inherently local and maritime law could be displaced:

> For not "every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313, 75 S.Ct. 368, 99 L.Ed. 337 (1955) (applying state law to maritime contract for marine insurance because of state regulatory power over insurance industry). A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law.

*Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 27 (2004).  The Court stated that no specific local interest had been identified by the party seeking application of this rule.  *Id.*  Moreover, "when state interests cannot be accommodated without defeating a federal interest, *as is the case here*, then federal substantive law should govern."  *Id.* (emphasis added).

5

Thus, there are two requirements for what is being argued:  (1) the contract in question is a maritime one, and (2) the dispute is so inherently local as to cause application of state law.  That is the law Crescent's insurers want us to apply, despite their otherwise vigorous contention that the lawsuit does not concern a maritime contract.  They acknowledge that the first time this issue was raised was in their opening brief on appeal.  We generally consider waived any issue not first presented to the district court. *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 510 (5th Cir. 2005).  This inherently-local-dispute issue certainly is a candidate for waiver.

Crescent's insurers, though, point us to opinions where we have held that "when a question is one of pure law, and when refusal to consider it will lead to an incorrect result or a miscarriage of justice, appellate courts are inclined to consider questions first raised on appeal." *Murray v. Anthony Bertucci Constr.*, 958 F.2d 127, 128 (5th Cir. 1992) (quoting *Nilsen v. City of Moss Point*, 674 F.2d 379, 387 n.13 (5th Cir. 1982), *rev'd en banc on other grounds*, 701 F.2d 556 (5th Cir. 1983)).  Further, our authority to consider late-breaking legal arguments has been recognized by the Supreme Court, which "characterized the matter of what issues a court of appeals may consider for the first time on appeal as 'one left primarily to the discretion of the courts of appeals, to be exercised on the facts of the individual cases.'" *Id.* (quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)).

The usual procedural rule that all issues must first be presented to the district court, leaving us to review that court's determinations, is an efficient approach that allows a full consideration of all the parties' arguments in the district court.  That is true even for purely legal arguments.  A thorough ruling might avoid an appeal by making clearer the unlikelihood of appellate success based on the strengths of the district court decision.  A clear reason to deviate

from the rule should be shown.  We see no excuse for the late introduction of this issue.  It is true that we altered some of the controlling law since the district court's ruling with our en banc decision in *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018).  Nothing in that decision, though, affected the applicability of the issue tardily raised by Crescent's insurers.

Finally, it is doubtful this issue would alter the outcome of the case.  In *Kirby* itself, the Court held both that no local interest had been identified but had a state interest been described, it "cannot be accommodated without defeating a federal interest," thus leaving maritime law in place.  *Kirby*, 543 U.S. at 27.  The federal interest is "for the uniform meaning of maritime contracts," which applies here as much as it did in *Kirby*.  *Id.* at 28.  If the contract here is maritime, the fact that it was to be performed in the territorial waters of Louisiana does not justify causing the outcome of this lawsuit to be different than if the contract was for work on the high seas.  Consistency and predictability are hard enough to come by in maritime jurisprudence, but we at least should not intentionally create distortions.  We do not exercise our discretion to consider this issue.

### B. Maritime contracts

Thus, we do have only one issue to decide: did Crescent and Carrizo enter into a maritime contract?  If the contract between Carrizo and Crescent is a maritime one, federal law applies and Louisiana's bar to indemnity provisions is inapplicable.  The district court determined when granting summary judgment that the contract was maritime.  Our review of the ruling is *de novo*. *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  The facts and evidence are viewed in the light most favorable to the nonmovant.  *James*, 743 F.3d at 68.

This circuit has dealt particularly extensively with issues that arise in determining whether a contract applicable to offshore oil and gas exploration should be categorized as maritime.  Recently, we concluded that a test we had created in 1990 for resolving those questions focused on incidentals that were not altogether relevant to the determination.  Removing some clutter, our en banc opinion simplified the mission of identifying such contracts.  We now only ask: (1) "is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters?" and (2) "does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?"  *Doiron*, 879 F.3d at 576 (revising the test announced in *Davis & Sons, Inc. v. Gulf Oil Corp.,* 919 F.2d 313 (5th Cir. 1990)).  An affirmative answer to both questions is necessary before the label "maritime" may be applied to the contract.  *Id.*

Significant parts of our prior law were explicitly unchanged.  For example, "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."  *Id.* at 575 (quoting *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir. 1986)).  Caselaw cited by Crescent's insurers also remains in place, namely, that maritime law generally does not extend to events that are confined to fixed platforms, as those structures are not vessels.  *See Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 360 (1969).  From such caselaw, the insurers argue that the accident here, which occurred on the fixed platform that was being decommissioned and not on one of Crescent's vessels, is not covered by maritime law.

Using our *de novo* review standard, we now apply *Doiron* to these facts.

No. 16-31214

*1. Was this a contract to provide services to facilitate the drilling or production of oil and gas on navigable waters?*

The *Doiron* test focuses the court on two separate questions: does the contract concern "the drilling and production of oil and gas on navigable waters," and if so, will the work be performed "from a vessel"? *Doiron*, 879 F.3d at 575. We start with whether the activity concerns development of oil and gas offshore. In its post-*Doiron* supplemental brief, Crescent's insurers raise two arguments under this factor. First, the contract did not facilitate the drilling or production of oil and gas because decommissioning oil wells is more analogous to construction of offshore platforms, which they say is not maritime activity. Second, the services were not on "navigable waters" because the decommissioning work occurred from the fixed platform itself. In response, Carrizo argues its contract with Crescent does qualify because plugging and abandoning oil wells is "part of the total life cycle of oil and gas drilling."

The life-cycle characterization draws in part from the fact that Louisiana requires site restoration when an oil or gas well is to be abandoned. *See* LA. STAT. ANN. § 30:4, *et seq.* To obtain an initial permit to drill, an applicant must provide financial security. *Id.* § 30:4.3A. The financial security will only be released "after plugging and abandonment and associated site restoration is completed and inspection thereof indicates compliance with applicable regulations or upon transfer of such well to another operator." LA. ADMIN. CODE tit. 43 XIX, § 104F (2017). It is fair to say that state law regulates the exploration for and production of oil and gas starting from the initial exploratory drilling in a likely location, through production when the exploration is successful, until the process ends by plugging and abandoning the well and removing such structures as state law requires. We conclude this contract for P&A work involved the drilling and production of oil and gas.

No. 16-31214

Crescent's insurers next argue that the plugging and abandoning work did not occur on "navigable waters." The focus is on caselaw concerning events that are confined to fixed offshore platforms and similar locations: "Admiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea." *See Rodrigue*, 395 U.S. at 360. Liberty Mutual argues that similarly, the fixed platform on which Corday Shoulder was injured in this case was not on "navigable waters."

It is true that where Shoulder was located when injured would have been relevant under the *Davis* test, which inquired what the worker was doing when injured. *See Davis*, 919 F.2d at 316. *Doiron* rejected that concern: "The facts surrounding the accident are relevant to whether the worker was injured in a maritime tort, but they are immaterial in determining whether the worker's employer entered into a maritime contract." *Doiron*, 879 F.3d at 573–74. We are no longer concerned about whether the worker was on a platform or vessel. The question is whether this contract concerned the drilling and production of oil and gas on navigable waters from a vessel. All parties acknowledge that the wells were located within the territorial inland waters of Louisiana and that the vessels involved in this contract were able to navigate to them.

We conclude that the contract between Crescent and Carrizo was to facilitate the drilling or production of oil and gas on navigable waters.

Before turning to the second factor in the *Doiron* test, we examine Crescent's insurers' argument that *Doiron* must be read in conjunction with other law that was not even discussed in that decision. The insurers seek to place barriers to contain *Doiron*'s effluence by deploying precedents involving the construction or deconstruction of an offshore, fixed platform from which oil and gas wells are drilled, or of related devices attached to the sea floor. *See Petrobas Am., Inc. v. Vicinay Cadenas, S.A.*, 815 F.3d 211 (5th Cir.), *order*

10

*clarified on reh'g*, 829 F.3d 770 (5th Cir. 2016); *Texaco Exp. & Prod. v. Amclyde Engineered Prod.*, 448 F.3d 760 (5th Cir.), *amended on reh'g*, 453 F.3d 652 (5th Cir. 2006); *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043 (5th Cir. 1990); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223 (5th Cir. 1985). Those cases support that torts occurring on and during the construction of fixed, offshore platforms for the drilling and production of oil and gas on the Outer Continental Shelf are generally not governed by maritime law. *See, e.g.*, *Texaco,* 448 F.3d at 771.

The analysis comes at least in part from a Supreme Court decision involving a worker who fell from a derrick to the fixed, offshore platform's floor. *See Rodrigue*, 395 U.S. at 353. A second worker in a companion case decided in the same opinion died when the platform crane he was operating collapsed, causing him to fall onto the deck of an adjacent barge. *Id.*

A recent melding of both *Davis* and one of the cases from the Crescent insurers' preferred collection is *Tetra Tech., Inc. v. Continental Ins. Co.*, 814 F.3d 733 (5th Cir. 2016). The broader question was whether under the Outer Continental Shelf Lands Act's ("OCSLA") requirements, the court was to apply Louisiana law as surrogate federal law. *Id.* at 738. A subordinate question was whether federal law, *i.e.,* maritime law, applied of its own force. *Id.* (citing *PLT*, 895 F.2d at 1047). The subject matter of the contract was the salvaging of a decommissioned well's platform on the Outer Continental Shelf. *Id.* at 740–42. As the court explained, the contract in question, which unfortunately was not in the record, contained obligations both for work on the fixed platform and on vessels. *Id.* at 739–40. Without knowing the details of the contract, we could not complete our analysis of the six factors of the then-relevant *Davis* test. *Id.* at 741.

11

Despite that the analysis was necessarily stunted, we find its progression to be helpful. It said there were two steps in deciding whether maritime law applied of its own accord: (1) identifying the historical treatment of contracts such as the one at issue, and (2) applying the six *Davis* factors. *Id.* at 740 (citing *ACE Am. Ins. Co. v. M–I, LLC*, 699 F.3d 826, 832 (5th Cir. 2012)). Yes, the *Tetra* court said, as the insurers argue here, contracts for "decommissioning, deconstructing, or salvaging a fixed platform used for oil and gas exploration on the [Outer Continental Shelf] . . . are not 'historically treated' as maritime contracts, and maritime law thus generally would not apply of its own force." *Id.* at 741.[2] That general law was not conclusive on the overall issue, though, because also relevant was the parties' specific contract applicable to that specific dispute. A detailed understanding was needed of the relative scope of the work on the fixed platform and from vessels, which the evidence on appeal did not allow the court to discern; thus, summary judgment was improper. *Id.* at 741–42.

We are not concerned here with those OCSLA issues of whether to borrow state law as surrogate federal law, which leads to analyzing whether maritime law applies of its own force, which requires determining the historical treatment of certain contracts. We do need to analyze, though, whether this is a maritime contract. *Doiron* now controls that endeavor.

We may not eliminate all doubt with a citation to learned commentary, but we conclude this issue by taking note of a comprehensive but unhappy article analyzing Fifth Circuit maritime law. Professor David Robertson

---

[2] The historical treatment can be seen from the following. OCSLA gives jurisdiction to federal courts over claims arising from the development of minerals on the OCS. *Texaco*, 448 F.3d at 768. As to fixed platforms there, the Supreme Court held that "accidents on these structures, which under maritime principles would be no more under maritime jurisdiction than accidents on a wharf located above navigable waters, were not changed in character by the [OCSLA]." *Rodrigue*, 395 U.S. at 366. Thus, accidents on fixed platforms on the OCS are not generally matters for maritime law.

discussed three of the cases Crescent's insurers are arguing are the appropriate ones to apply here.  David W. Robertson, *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes*, 38 J. MAR. L. & COM. 487, 541–42 (*PLT*), 562–64 (*Texaco*), 566 (*Laredo*) (2007).  In *Doiron*, we cited the article as being helpful in our revisions to *Davis*.  *Doiron*, 879 F.3d at 572 n.20.  The author also discussed the *Davis* opinion, expressed his disagreement with the need for most of the six elements of the *Davis* test, but never hinted there was an inconsistency between cases relying on *Rodrigue* and cases using *Davis* to classify contracts as maritime or not.  Robertson, *supra*, at 542–49.

Professor Robertson described the purposes of *Davis* in a more limited way than would this court, but it is the purpose relevant to this case:

> The OCS [Outer Continental Shelf] oil patch is latticed with contracts and subcontracts. Litigation arising from injuries to OCS workers ordinarily entails claims for contractual indemnity among the putative tortfeasors. Whether a contract calling for indemnity is maritime or not is a recurrently dispositive question. "[I]f the contract is a maritime contract, federal maritime law applies of its own force, and state law does not apply."  If the contract calling for indemnity is not a maritime contract, the governing law will be adjacent-state law made surrogate federal law by OCSLA § 1333(a)(2)(A). Very often the applicable adjacent-state law will be that of Texas or Louisiana.

> Both Texas and Louisiana have anti-indemnity statutes that will invalidate most indemnity contracts. Federal maritime law, on the other hand, shows no hostility to indemnity agreements[.]

> . . .

> The Fifth Circuit regularly complains about how difficult it is to tell whether an OCS indemnity contract is maritime.  In *Davis & Sons, Inc. v. Gulf Oil Corp.* Judge Rubin made a heroic effort to synthesize the circuit's jurisprudence into something that made sense . . . .

*Id.* at 542–43 (footnotes omitted). The good professor concluded that despite being heroic, the effort in *Davis* failed. The en banc court in *Doiron*, after 25-plus years of applying *Davis*, at least agreed that a change was due.

This reference to a scholarly effort to organize the caselaw is to show that *Davis* previously and *Doiron* now are performing the task of determining how to classify contracts. That classification has often been employed to determine whether indemnity provisions are enforceable but is not so limited. Our analysis in the past under *Davis* was consistent with the caselaw cited to us by Crescent's insurers. Consistent now is our application of *Doiron*.

Finally, regardless of what other Fifth Circuit caselaw there may be, nothing in such caselaw detracts from the clarity of our 2018 en banc decision in *Doiron*. We are here classifying a contract for a certain purpose, a judicial activity that has been done consistently with the 1969 *Rodrigue* decision at least since our 1990 *Davis* decision. We en banc eliminated most of the factors, narrowing our focus, but we did not fundamentally change the task. *Doiron* is the law we must apply.

### 2. Does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

We now examine whether the Crescent-Carrizo contract contemplated that a vessel would play a substantial role in the performance of the contract. Among the directions given by *Doiron* on what "substantial" means is that if "work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract." *Doiron*, 879 F.3d at 576 n.47. We quoted part of the Supreme Court's *Kirby* discussion, from which the word "substantial" was taken: "Conceptually, so long as a bill of lading requires *substantial* carriage of goods by sea, its purpose

14

is to effectuate maritime commerce – and thus it is a maritime contract." *Id.* at 576 (emphasis added) (quoting *Kirby*, 543 U.S. at 27). We also draw from our *Doiron* discussion a "rule of thumb" used in Jones Act cases:

> A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases.

*Id.* at 576 n.47 (quoting *Chandris, Inc. v. Latsis,* 515 U.S. 347, 371 (1995)). The court also declared that any determination of the significance of the vessel "would not include transportation to and from the job site." *Id.*

The Crescent insurers argue that measuring the anticipated use of the vessel should follow OCSLA caselaw where, for purposes of deciding the situs of the controversy, we are to consider where the majority of work was performed under "the focus-of-the-contract test." *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 781 (5th Cir. 2009) (en banc). We do not see the usefulness of that law to our task. *Doiron* did not hold that to be a maritime contract, the parties must have contemplated that a vessel will be used for a majority of the work. Such a rule would be inconsistent with the explicit suggestion in *Doiron* that "substantial" can mean 30 percent, considerably less than a majority.

We must remember that the contracting parties' expectations are central. It was not enough in *Doiron* that a vessel ultimately had a key role in the completion of the needed work because that was unexpected and occurred only after initial efforts without a vessel failed. *Doiron,* 879 F.3d at 577. In searching for expectations here, we start with examining the contractual obligations. The Turnkey Bid is the relevant document, as the Master Service Agreement's more general language does not address the details of the P&A work. The first page identifies the equipment being provided that would

15

perform the P&A work itself, the work crew details, and a description of three vessels. Thus, unlike in *Doiron*, a need for vessels was understood. The vessels were a tug, a cargo barge, and the OB 808 barge on which equipment and the quarters for the work crew were located. Our analysis of "substantial" ignores the need for vessels to transport equipment and crew to the platform and considers only the other roles the vessels played. *Id.* at 576 n.47

The Turnkey Bid included a daily charge for use of each of the three vessels. The daily charge for all three was $4,000. Crescent states that the vessels were used for 33 days, resulting in a total cost of $132,000. Liberty Mutual uses those numbers in its supplemental briefing to say the vessels' cost was 37 percent of the total contract bid of $360,735.20. Our precise fact issue, though, is what was anticipated when the contract was entered. The operations manager for Crescent testified that the time for completing the work "was way more than what we estimated." He was not asked what had been the estimated number of days.

We now examine the use of the key vessel, the OB 808. The only crane involved in the work was on the barge, moving equipment and materials back and forth from the cargo barge to the well platform. The injured worker, Corday Shoulder, testified that the three well platforms were small and there was not enough room for all the equipment. The wireline unit was among the equipment that remained on the barge. We mention the wireline unit in particular because its purpose is central to plugging and abandoning the well. We once described the work this way:

> A "wireline" is a continuous cable used to perform various subsurface functions in a well, including the lowering and raising of various tools, instruments, and other devices. One of the downhole tools used on a wireline is a "perforation gun," a device that originally used cartridges similar to rifle or pistol ammunition but evolved to use "shaped charges," cylinder-shaped ammunition

which is cone-shaped internally and fires directionally. It is formed in layers, one a brittle compound of explosive material and the other a metal alloy. When fired by any of several methods, this bazooka-like ammunition shoots a short, concentrated stream of molten alloy or "plasma" in the direction at which the open end of the charge's conically shaped interior is aimed. Generally, perforating guns are used either early in the life of a well to fractionate ("frac") a hydrocarbon-bearing formation or zone so as to commence or enhance production or, late in the life of a well or of a particular formation, to perforate casing or tubing in preparation for "squeezing" or sealing off the well or the zone to "plug and abandon" it.

*Roberts v. Cardinal Servs.*, 266 F.3d 368, 371–72 (5th Cir. 2001).  The district court's decision in *Roberts*, written by Judge Clement a year before she became a member of this court, called the wireline operation in P&A work an "essential component of the drilling process." *Roberts v. Cardinal Servs., Inc.*, 2000 WL 1300390, at *3 (E.D. La.  2000).

The significance of the wireline operation is also highlighted in this record.  Shoulder testified that about 50 percent of the P&A operation was wireline work.  Further, in Crescent's statement of undisputed facts filed in the district court, it declared that the work on the well on which Shoulder was injured "involved primarily wireline services."  Surely, wireline work was similarly dominant as to the other two wells.

Mentioning wireline operations requires us to acknowledge that for 30 years, Fifth Circuit law has been that such work from a vessel is not a maritime activity.  *See Thurmond v. Delta Well Surveyors,* 836 F.2d 952, 955–56 (5th Cir. 1988).  We recently criticized that opinion, criticism that matters because it was expressed en banc, because *Thurmond* and its descendants improperly focus on whether services were inherently maritime as opposed to whether a substantial amount of the work was to be performed from a vessel.  *Doiron*, 879 F.3d at 573.  Indeed, almost "none of these services [for offshore oil and

gas operations] are inherently maritime." *Id.* What is important in the present case is that use of the wireline unit on the vessel was central to the entire P&A contract.

As to other uses of the OB 808, Shoulder drew a sketch of what was on the OB 808. He outlined crew quarters, a galley, some offices, the mud tank, the wireline unit, a crane, its generator, and a pump. There is no statement that leaving all this equipment on the barge had been originally planned, nor is it clear which features were structurally part of the OB 808. Still, surely the investigation Crescent performed in order to estimate its costs before bidding caused it to understand the space limitations and to plan in advance where equipment would need to be. Also relevant to the importance of this vessel, Carrizo adds that "Crescent designed and built the OB 808 for the specific purpose of decommissioning wells at the end of their productive cycle."

Certainly, then, the parties anticipated the OB 808 would be indispensably involved in performance of the contract. A vessel's being indispensable may not equate to its role being "substantial," though. In attempting to define "substantial role," Liberty Mutual and Starr argue that a vessel does not play a substantial role when it is being used as a "work platform" rather than as a navigable, self-propelled water vehicle. We do not see its role as being properly demeaned in this way, so long as the vessel is being used for more than transporting between land and the wellsite. Indeed, its necessity as a work platform is particularly relevant. To the extent there was not enough space on the fixed platform for the equipment, such as for the wireline unit, the role of the vessel becomes more significant. Its utility as a work platform comes from its being a vessel, as it could be positioned as needed at the well site, then proceed to the other wells to perform similar functions. According to Carrizo, the OB 808 was being used every day, certainly as crew

quarters but also for its crane, the wireline unit, and other equipment that could not be moved onto a platform.

In conclusion, this contract anticipated the constant and substantial use of multiple vessels. It was known that the OB 808 would be necessary as a work platform; that essential equipment would need to remain on that vessel, including a crane; that the most important component of the work, the wireline operation, would be substantially controlled from the barge; and that other incidental uses of the vessel would exist such as for crew quarters. This vessel and the other two vessels were expected to perform an important role, indeed, a substantial one, under the Crescent and Carrizo contract. It was a maritime contract. The Louisiana Oilfield Anti-Indemnity Act does not apply.

AFFIRMED.